EXHIBIT "A"

# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSLYVANIA

Corey Bracey,

Plaintiff

v.

Shirley Moore-Smeal; Jeffery Beard; Andrea Meintel; Richard Eilers; Kathleen Gnall; J. Barry Johnson; Brian Coleman; DSFM Gates; DSCS Arnell; Major Zaken; Carl Walker; Counselor Bustass; Captain Berrier; William Legget; Dr. Savaadra; Dr. Galucci; Dr. Fonder; MHM Correctional Services, Inc.; DSCS Bryant; DSFM Hall; CCPM Woods; DSCS Hannah; DSFM Whietsel; CCPM Biser; Jon Fisher,

Defendants

---

## JURY TRIAL DEMAND
## Civil No. 1:11 CV-00217
## AMENDED COMPLAINT

---

## INTRODUCTION

This is a civil rights action filed by Corey Bracey, a state prisoner currently housed at the State Correctional Institution of Smithfield, seeking relief under 42 U.S.C § 1983 alleging denial of bodily integrity, cruel and unusual punishment in illegal housing, denial of Due Process of Law; in violation of the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution. The Honorable Court's supplemental jurisdiction is invoked over state law violation that arised out of the same events. 37 Pa Code 93.11. This is a multi-defendant and multi-

(1)

district complaint of unconstitutional conditions of confinement; that subsequently transcended into state law violations of Due Process in regards to Administrative Custody classification. All events, transactions, and occurrences as described are one chain of events during Plaintiff's housing at State Correctional Institutions Fayette, Albion, and Smithfield.

## I. JURISDICTION

1. This Court has jurisdiction over the Plaintiff's claims of violation of Federal Constitutional rights under 42 U.S.C § 1331 (a) and 1343. The Honorable Court further has jurisdiction to entertain the state law claims pursuant to its Supplemental Jurisdiction, Title 28 USCA § 1367.

## II. Parties

2. Plaintiff was a state prisoner housed at State Correctional Institutions Fayette, Albion, and Smithfield at all times relevant to this action. Plaintiff is currently housed at Smithfield.

## III. DEFENDANTS

3. Jeffery Beard was the Secretary of the D.O.C at all times relevant, and in that capacity Beard was responsible for the care, custody, control and the conditions of confinement which Plaintiff was housed during Beard's tenure as Secretary. Beard had policy making authority in concern to the safe and secure operations, housing, and treatment services of the D.O.C in compliance with the United States constitution and laws of Pennsylvania, as well as Administrative Directives and policy statements promulgated by the D.O.C.

4. Shirley Moore-Smeal was the Acting Secretary of Corrections during the times described herein. She held statewide authority and direction over the Pennsylvania Department of Corrections. As relevant, Smeal authorized for Plaintiff to be placed on the Restricted Release List (RRL).

5. Defendant Andrea Meintel was the Director of the Bureau of Treatment Services for the D.O.C during times described herein; responsible for planning, developing, directing, and coordinating the delivery of treatment services to prisoners, encompassing mental health programs. Defendant Meintel held administrative and a central office managerial position developing the programs, policies, and procedures

to implement treatment services in the D.O.C institutions and developing guidelines and standards to control the delivery of treatment services to prisoners.

6. Richard Ellers was the Director of Bureau of Health Care, responsible for managing, supervising and assigning medical doctors to the D.O.C institutions, directly working and consulting with outside contractors of the D.O.C to accomplish the same. This defendant held statewide authority in developing policies, planning, and procedures of effectively ensuring prisoners had adequate access to Health Care services through assigning appropriate medical staff to its institutions.

7. Kathleen Gnall as the Deputy Secretary for Re-Entry and specialized treatment services, directly supervised Meintel in planning, developing, directing, and coordinating the delivery of treatment services to prisoners, encompassing mental health programs, through conferences and written reports of Meintel and other involved individuals.

8. Barry Johnson, was the DOC Western Regional Deputy Secretary in charge of overseeing all superintendents of DOC facilities within the Western Region to ensure proper care, custody, control and conditions of confinement were administered in conformity to the laws and constitutions of Pennsylvania and the United States. This defendant also submitted recommendations for RRL designations as applicable herein.

9. Brian Coleman was the Superintendent of Fayette at all times relevant herein, having direct supervision of total operations at Fayette. Coleman was also responsible for forwarding recommendation for RRL designations for Fayette prisoners to Defendant Johnson.

10. Gates was the Deputy Superintendent of facility management at Fayette also sitting as the chairperson of the Program Review Committee of the special Management Unit at Fayette. This defendant was responsible for facility security, and an integral official in the operation of the special management Unit and voting for RRL designations as applicable herein.

11. Arnell was the Deputy Superintendent for centralized services in charge of supervision and implementation of practices, policies, and procedures in rendering appropriate medical and mental health care services. Also a voting member in RRL designations of Fayette prisoners.

(3)

12. Zaken was the Major of Guards at Fayette in charge of security of the institution, subordinate only to Gates and Coleman at Fayette. Zaken also sitting as a Program Review Committee member of the Special Management Unit being an integral official in the total operation of the SMU program. Also casting vote for RRL designation of Fayette prisoners.

13. Walker was the Unit Manager of the SMU program at Fayette. Having authority and insight in the total operation of the SMU at Fayette. Also sat as a PRC member of the SMU at all times relevant herein. This defendant would cast votes for RRL designations of Fayette prisoners.

14. Bustass was the Fayette SMU counselor having responsibility in offering counseling services, recommendation of treatment programs, and processing necessary paperwork of the SMU prisoners for various reasons. This defendant sat as a regular SMU PRC member giving insight and suggestion. Also would cast vote for RRL designation of Fayette prisoners.

15. Defendant Berrier was the captain of the L-S housing area at Fayette having hands on supervision of daily operations in the RHU and SMU encompassing L and J Blocks. This defendant was also granted authority to implement security restrictions on prisoners in the L-S.

16. Legget held tenure as the L-S captain at Fayette being succeeded by Berrier. Duties included hands on supervision of all facets of operation of L-S housing at Fayette.

17. Dr. Saavadra was the assigned psychiatrist at Fayette, offering psychiatric services to its prisoners, encompassing SMU and RHU patients.

18. Dr. Gallucci was the psychology manager at Fayette, overseeing the application, procedure, and practices of rendering psychological services to the prisoners of Fayette and directly supervising the psychologist of the institution, licensed and unlicensed.

19. Bryant was the Deputy Superintendent of Centralized Services at Albion at all times relevant. Sat as the PRC chairperson at Albion in authority over plaintiff's programming and classification as applicable herein, while housed at Albion.

20. Hall was the Deputy Superintendent for Facility Management at Albion at all times relevant. Sat as the PRC ~~chairperson~~ member at Albion in authority over Plaintiff's programming and classification while housed there.

21. Defendant Woods was the Corrections Classification Program Manager (CCPM) at all times relevant. Sat as a PRC member at Albion in authority over Plaintiff's programming and classification while housed at Albion, as applicable herein.

22. Defendant Hannah was the Deputy Superintendent for Centralized Services at Smithfield at all times relevant. Sat as the PRC chairperson at Smithfield in authority over Plaintiff's programming and classification while housed at Smithfield, as applicable herein.

23. Whietsel was the Deputy Superintendent for Facility Management at Smithfield at all times relevant. Sat as a PRC member at Smithfield in authority over Plaintiff's programming and classification while housed at Smithfield.

24. Superintendent Fisher was in charge of total operations at Smithfield also oversaw and approved decisions of the PRC in concern to Plaintiff's programming and classification while housed at Smithfield, as applicable herein.

25. Dr. Ponder was the treating psychiatrist of Plaintiff during an involuntary mental health commitment in April 2010. Was an employee of MHM Correctional Services, Inc.

26. MHM Correctional Services, Inc (hereinafter MHM) was an outside contractor of the D.O.C providing mental health staffing to the institutions of the DOC providing mental health staffing to the institutions of the DOC. MHM was the employer of Saunadra and Ponder at all times herein.

27. Biser was the corrections classification Program Manager (CCPM) at Smithfield. Also sat as a PRC member in charge of Plaintiff's programming and classification while housed at Smithfield, as applicable herein. All defendants are sued in their individual capacities.

IV. FACTS

28. Within the Department of Corrections the Department maintains "Specialized Housing Units" which are designated for specialized programs and/or treatment services. These Units are Security Level 5 Units that include the

(5)

the Special Management Unit (SMU) and the Secure Special Needs Unit (SSNU).

29. The SMU is defined as, "Special Units within designated Department facilities designed to safely and humanely handle an inmate whose behavior presents a 'serious threat' to the safety and security of the facility, staff, other inmate, or him/herself." As a result of the type of inmates housed in this Unit and behavior modification control ~~techniques~~ techniques at use, the mentally retarded, physically handicapped, and those with identifiable mental health issues are prohibited from confinement in this Unit (Per, 6.5.1 Procedural Manual).

30. The SSNU on the other hand is defined as, "...designated to provide an inmate, who has identified 'significant' mental health 'concerns' ... the opportunity of a specialized treatment program to assist him/her in returning to a general population Special Needs Unit (SNU) or other appropriate disposition. This program will 'treat' an inmate for a maximum of 18 months, unless extended by the SSNU Treatment Team." (see, 13.8.1 Procedural Manual).

31. Because of the concentrated program and treatment employed in these Units, the Department has created a liberty interest in the process that must be observed before being transferred to either the SMU or SSNU. A prisoner must recieve a hearing, opportunity to be heard, and avenue of appeal before placement in the SMU or SSNU. It is mandated each Unit be operated seperate from one another.

32. Despite the clear directives of policy and established laws, defendants in concert housed classified mental health SSNU prisoners in the SMU at Fayette, together with SMU and Restricted Housing Unit (RHU) prisoners that caused disastrous conditions of confinement in the years of 2009 and 2010, as applicable to this complaint.

33. As discussed later, Plaintiff as an RHU Prisoner was forced to endure this atypical significant hardship without Due Process of Law that resulted in him having a mental health breakdown and being involuntarily committed to a State mental health Unit at S.C.I Cresson, as "severally mentally disabled"

in April 2010.

34. In the months of June-September 2009, Plaintiff was an RHU prisoner housed in the RHU J/Block Fayette serving a disciplinary sanction.

35. RHU staff's disdain for Plaintiff culminated in an excessive use of force in September 2009 in the RHU on J/Block of Fayette. Plaintiff was rapidly punched to the face, choked, and head banged off of the concrete floor. The attack resulted in Plaintiff sustaining several injuries, some of which permanent: lacerated chin causing profuse bleeding; contusions to head; blurred vision; short term memory loss; restricted movement of neck; and extreme pain to jaw and head that lasted for several days.

36. Immediately after the attack Defendant Legget ordered that Plaintiff be taken to the SMU and placed in a camera observation self-contained cell. Plaintiff would reside in this harsh cell-assignment for the course of the next eight (8) months without cause, at the orders of Legget then succeeded by Defendants Berrier and Walker. There were numerous self-contained cells available that did not have in-cell camera.

37. The particular cell assignment was considered "alternate housing". There was an in-cell camera constantly recording and manned; in-cell shower, and attached exercise cage to back door of cell. When placed in this cell one would be totally isolated rarely having to exit the cell. The cell in the winter months during Plaintiff's confinement was unbearably cold where the back door was uninsulated for some time. Privacy when using the bathroom or any other act of modesty was non-existent, where covering the camera was strictly prohibited and could result in an issued misconduct or cell-extraction. The use of these cells at other institutions of the Department were discontinued by Defendant Beard during his tenure, being deemed as counter-conducive to "Rehabilitation".

38. During Plaintiff's illegal housing in the SMU he found crushed glass in his food as threatened by an SMU officer when giving him his tray, "I hope you got a strong stomach." Afterwards, Plaintiff had blood in mouth, and excruciating pain in making a bowel movement the next

morning, having what appeared to be blood in his stool. This was the result of Plaintiff having an argument with the officer. Plaintiff later learned this means of torture was not uncommon occurrence in the SMU.

39. The food poisoning was only the beginning of events in the totality of conditions of confinement in the SMU that had adverse effects on Plaintiff's mental stability.

40. As stated earlier, SSNU, SMU, and RHU prisoners were illegally being housed together in the SMU of Fayette. This left the SSNU prisoners to go untreated, their condition being further exacerbated by the SMU prisoners who taunted, ridiculed, and persecuted them for their mental issues. As well, with no SSNU treatment program available these mental health prisoners were punished with extreme behavior modification control techniques as a result of their uncontrollable behavior.

41. As mandated by the 13.8.1 procedural manual any prisoner housed in L-5 for over thirty (30) days are to be psychologically assessed and every ninety (90) days thereafter. Those on the mental health roster (e.g. SSNU prisoners) are to be psychologically assessed every thirty (30) days. This mandate of policy was disregarded by defendants with indifference that enabled SSNU, SMU, RHU prisoners to mentally deteriorate without detection and/or preventable care, including Plaintiff. This being another factor leading to his mental breakdown.

42. With the mixed classification of prisoners in the SMU in violation of all internal operating procedures and directives created an environment that was insane to say the least, Suicide attempts and self-mutilatation were the norm. Chemical munitions were used on a daily basis that everyone was forced to endure. Excessive physical restraints were used to the point of physical injury. Feces smearing on walls and in the vents were routine, at times being left without cleaning and/or sanitizing subjecting prisoners to communicable diseases. Prisoners would throw bodily fluid on one another in psychotic rages in the exercise cages. The denial of food was a common means of punishment and control. Banging on toilets, walls, and doors was at all hours of the day and night, causing insomnia and delerium. Racial epithets were spewed by the

guards without restraints even drawing racially derogatory caricatures on the outside of some prisoners' cell doors. In-cell lighting was 24/7 causing Plaintiff eye problems, etc.

43. Defendants Dr. Savaadra and Gallucci were the assigned psychiatrist and psychology manager at Fayette. Both had SMU and SSNU prisoners under their care and were aware that there was no SSNU program for the SSNU prisoners and the SMU was being operated in contravention of policy and established law. Both were also intelligent to the fact mandated evaluations were not being conducted in the SMU, thereby allowing prisoners mental stability to go unattended with indifference. These defendants were physically present in the SMU to witness the torturous conditions of confinement.

44. During this time Plaintiff continued ~~pushing~~ pushing his pen exposing the practices in the SMU and asking to be transfered out of the barbaric enviroment. In reply to Plaintiff's assertions of housing the mentally ill with no treatment and non-mentally ill together in the SMU, Plaintiff recieved a response from Central Office with input from Defendant Meintel. The practice was approved and supported by Meintel in that; "A review of the record by the Bureau of Treatment Services shows DOC policy does not state that an offender with little or no mental health services [SIC] (illnesses) is not to be housed near offenders with mental illnesses." (see, final review response #319693 & 320297). In fact, DOC policy does say the severally mentally ill are not to be housed with the non-mentally ill.

45. In another response from Central office with solicited input of Defendant Ellers exposed another use of the SMU that was unofficial and being experimentally employed in secrecy. It was disclosed as follows: "You (Plaintiff) have a long history of SMU placement. SMU is a program that attempts to involve inmates and 'motivate' them to participate in mental health treatment..". (see, final grievance response #362020). This amounting to forced mental health treatment against one's will accomplished by means of behavior modification control techniques. Physical punishment was the only mental health treatment in the SMU.

46. Plaintiff as well brought the violations to the attention of Defendant Beard, via correspondence. Beard acknowledged reciept of Plaintiff's letter and responded through his delegate. Beard's response not only gave his approval of the illegal conditions of confinement in the SMU but, openly committed acts of fraud and falsification of State documents to conceal the conditions in the SMU Fayette.

47. Beard responded that L/Block of Fayette was not the SMU but, the RHU and was being appropriately operated. (see, Central Office File #2010-C38-000000031). Beard turned a blind eye and deaf ear to constitutional violations in the SMU under the guise of the "code of silence." It has already been established that L/Block, Fayette, at all times described herein was the SMU and not the RHU. (See, RTK request #0766-11). Beard as well made a personal visit to the SMU seeing the mixed classification himself during Plaintiff's stay.

48. In the month of April 2010, due to the totality of conditions of confinement in the SMU as previously explained, Plaintiff fell into a deep state of incoherence that caused him to stop eating, talking and observing daily activities of life.

49. He eventually missed a total of fifty-one (51) consecutive meals that adversely affected his cardio vascular system to such a degree, upon an EKG Plaintiff was diagnosed with an irregular heartbeat due to no eating for a substantial time that raised concerns of him having a heart attack and/or stroke. Plaintiff lost approximately twenty (20) pounds of muscle and body fat, experienced fatigue, dehydration, stomach naseau, extreme headaches, mental distortions, loss of memory, dizziness, and gross malnutrition.

50. In April 2010, Plaintiff was involuntarily admitted for emergency mental health treatment under the mental health procedures Act, section 302. His commitment was thereafter extended under section 303 of the same act, where Plaintiff was deemed to still be "swerally mentally disabled", with diagnosis of depression disorder with psychotic features. (e.g. episodic illness; characterized by anger from paranoid ideations; and possibly paranoid delusional).

51. Defendant Fonder was Plaintiff's treating psychiatrist during his commitment to S.C.I Cresson MHU.

52. Dr. Fonder during Plaintiff's individual sessions explained he was suffering from a Major depression disorder; due to the incident of food poisoning, conditions in the SMU; total isolation, constant observation, etc.

53. Plaintiff then asked for a recommendation of transfer out of the SMU or other housing that would be conducive to his mental health needs.

54. Dr. Fonder admitted in her professional opinion it would be detrimental to keep Plaintiff in the SMU, and it was highly likely he would get worse while housed in a sensory deprived enviroment as the L-5. But, she declined to give the recommendation where she stated, "My administrator's told me not to get caught up in anything legal between you and the D.O.C."

55. Fonder's administrator's could be no other than Defendant MHM whom she was employed by, a contractor of the D.O.C providing mental health staffing. For MHM employees to cause waves with the DOC would be bad for business and could result in an employee being blackballed. Fonder in suit downgraded his diagnosis from "major depression" as she told him, to "depression Nos" in attempt to minimize his condition and source of depression stemming from housing in the SMU.

56. After Plaintiff's discharge from the MHU in May 2010 he was transferred back to the SMU. He was now under psychotropic medication treatment of anti-depressants.

57. Plaintiff continued to object on the formal record as to his confinement in the SMU without Due Process of Law. (e.g. hearing, opportunity to be heard, avenue of appeal).

58. Defendant Walker as the SMU Unit manager did not like Plaintiff's gripes. In a tirade Walker informed Plaintiff he was well aware of how Plaintiff vindicated his innocence in three (3) malicious prosecutions of the D.O.C.

59. Walker was quite forthcoming, "You may have beat three cases but you're not as smart as you think you are. Now i got enough misconducts on your ass to bury you back here. I don't care what it takes and how many favors I have to pull, your ass will go on RRL!" Walker was referring to Plaintiff being

criminally charged with assault on officer on three occasions. Plaintiff was exonerated twice at trials, and one withdrawn prosecution.

60. To accomplish this Walker used Plaintiff's illegal housing in the SMU as pretext to pursue RRL. True to form, he orchestrated Plaintiff being reassigned to his caseload as an SMU inmate, even though Plaintiff was RHU and never classified as SMU. Plaintiff was simultaneously changed to Defendant Bustass' caseload as well, as the SMU conselor. This gave Walker wide latitude and direction in getting Plaintiff approval for RRL Placement, because in the computer system it would appear Plaintiff was an SMU failure, which is criteria for RRL.

61. Due to intervention from an outside prisoner rights organization Plaintiff was transferred out of S.C.I Fayette on June 29, 2010 to S.C.I Albion.

62. Nevertheless, while at Albion Walker in concert with Defendants Bustass, Zaken, Gates, Arnell, and Coleman passed a vote sheet recommending to have Plaintiff approved for RRL, and submitted to Defendant Johnson at Central Office. Johnson upheld the recommendation of approval and submitted to Smeal for final approval. Smeal signed off giving final approval and authorization to place Plaintiff on RRL.

63. Again, Plaintiff was denied Due Process of Law as established by 37 Pa Code 93.11, accomplished through DC-ADM 802 (Administative Custody). Once Plaintiff was transfered out of Fayette, Fayette officials had no jurisdiction to submit a recommendation for RRL of Plaintiff while he was housed at another institution (Albion). Further, with this knowledge Johnson nor Smeal should have given their approvals with the deviations of Due Process and policy.

64. Plaintiff brought the circumventions of policy to the attention of Defendants Hall, Bryant, and Woods during a PRC interview. These defendants conceded that Fayette initiated the process while Plaintiff was housed at Albion, and they had nothing to do with the RRL Placement. But, refused to do anything as to correct the issue taking a hands off approach and directing Plaintiff to address his concerns to Fayette.

65. Plaintiff introduced to their attention a declaration submitted by the DOC's Office of Chief Counsel's declarant, Joanne Torma, an expert in RRL designations.( See, RTKL request appeal #2011-0005). This declarant explained

that RRL classification is "Administrative Custody (A/c)" status. She further declared that improper classification "constitutes a danger to the inmates, other inmates, staff or the general public." Id. Plaintiff also introduced DC-ADM 802 procedural manual furthering the same.

66. Despite the indisputable documentary support, defendants ignored the violations and continued Plaintiff on disciplinary custody status illegally.

67. Plaintiff was thereafter transferred to Smithfield. At a PRC interview Plaintiff presented the same documentary evidence and proof of his illegal placement on RRL by Fayette, and his improper classification as Disciplinary Custody instead of Administrative Custody status as RRL to Defendants Hannah, Biser, and Whirtsel. Defendants conceded to Plaintiff's proof but, they refused to alter Fayette's handiwork. Plaintiff was again directed to address his concerns to Fayette. He has done this only to be ignored. Defendant Fisher formally signed off approving of Hannah, Biser, and Whirtsel's choice not to intervene.

68. Because Plaintiff is inappropriately classified as disciplinary custody and not Administrative Custody as an RRL prisoner, he has never had a Due Process hearing of his RRL placement, opportunity to be heard, or avenue of appeal as prescribed by DC-ADM 802. Nor is Plaintiff permitted to appeal the "continuation" of RRL confinement every ninety (90) days as also available under DC-ADM 802. These procedures are non-existent under DC-ADM 801 as Plaintiff is improperly classified while RRL, effectively giving him no available administrative remedy to challenge his RRL designation in violation of 37 B Code 93.11. RRL is governed by DC-ADM 802, yet, Defendants classify him under DC-ADM 801 denying him Due Process.

69. The placement on RRL has caused Plaintiff an atypical significant hardship, RRL is considered indefinite solitary confinement. Plaintiff is barred from taking his prescribed programs to enable him of becoming eligible for parole consideration, effectively lengthening his sentence.

10. Further, Plaintiff is a documented mental health prisoner, Since Plaintiff's placement on RRL his mental health has drastically deteriorated. Plaintiff has been admitted under psychiatric observation several times for auditory hallucinations and suicidal ideations. He is now prescribed heavy dosages of anti-depressant and a highly potent anti-psychotic of Haldol ; causing lock-jaw, swelling of the tongue until the mouth cannot close, uncontrollable muscle spasms ; liver damage ; attack of the white blood cells ; loss of eyesight, etc. Plaintiff must chose between the damaging effects of the medication or becoming acutely suicidal when being unable to ~~deal~~ mentally cope with indefinite solitary isolation.

11. Nor can Plaintiff recieve group therapy or "confidential" individual therapy while on RRL, where his meetings with psychology/psychiatry have been limited to interviews at his cell door in company of other confined prisoners, that sends a chill effect for Plaintiff to open up to recieve meaningful evaluations. In fact, Plaintiff was denied a formal mental health evaluation at the Special Assessment Unit (SAU), for possible transfer to a mental health treatment program that he is otherwise qualified for (e.g. ICU, FTC), solely due to his RRL status.

12. While on RRL Plaintiff has experienced weight loss (approximately 30 pounds of muscle and body fat) due to deficient diet and no commissary to supplement ; lathargia for lack of proper exercise and sunlight ; arthritic ailments due to cold cell and restrained movement ; claustrophobia, anxiety and depression ; barred from having contact visits with family ; telephone calls to keep in touch with the outside world ; inability to earn pay in a prison job, placing a financial burden upon Plaintiff ; being prohibited from rehabilitative schooling in trades and technical training that is available to other prisoners, etc. In its totality, Plaintiff's RRL placement has presented an atypical significant hardship entitling him to the protections of Due Process at law in the mandates of 37 Pa Code 93.11.

## V. CAUSE OF ACTION

13. Defendants Beard, Meintel, Eilers, Gnall, Coleman, Gates, Arnell, Zaleen, Walker, Bustass, Saavadra and Gallucci all had direct knowledge the RHU, SMU, and SSNU prisoners were being housed together in the SMU at Fayette in contravention of every mandate of policy of the Department. These defendants know that there was

no SSNU treatment Program available, leaving the SSNU Prisoners to mentally deteriorate, with their mental illness being exacerbated by confinement in the ~~SMU~~ SMU, which in turn caused these Prisoners to act out and cause unconstitutional conditions that the non-mentally ill were forced to endure. This environment caused by defendants resulted in Plaintiff suffering from a mental health breakdown due to such. All were in Position to either correct the illegal mixed classification or give professional opinion against it, but chose not to lending that support and authority of office to each other; and advised, assisted, ratified, and/or approved of such violating Plaintiff's Eighth and Fourteenth Amendments to the United States Constitution.

74. Defendants Beard, Meintel, Ellers, Gnall, Coleman, Gates, Arnell, Zaken, Walker, Bustass, Dr. Savaadra, Gallucci all had direct knowledge that the SMU was covertly being operated for the mental health treatment on non-mentally ill prisoners without Due Process of Law, accomplished by behavior modification techniques. All lent their support and authority of office to each other; and advised, assisted, ratified, and/or approved of such violating Plaintiff's Eighth and Fourteenth Amendments to the United States Constitution.

75. Defendants Coleman, Zaken, Walker, Berrier and Legget either directly authorized or approved of Plaintiff being housed in a POC cell for the course of eight (8) months that was a contributing factor to Plaintiff's mental health breakdown, where he experienced claustrophobia, paranoia, and anxiety knowing that he was constantly being watched, also being totally isolated from sensory stimulation. Further, by the Defendants' authority Plaintiff was denied bodily integrity where the viewing monitors of Plaintiff's cell were in clear view of anyone walking past the SMU control booth, this including prisoners and staff, while Plaintiff was in compromising positions (nudity) while using the bathroom, taking showers, etc. without cause. This arbitrary cell assignment amounted to a violation of Plaintiff's Fourth and Eighth Amendments to the United States Constitution.

76. Defendants Smeal, Johnson, Coleman, Gates, Arnell, Zaken, Walker, Bustass, Bryant, Hall, Woods, Hannah, Whietsel, Biser and Fisher all directly participated in violating state law (37 Pa Code 93.11) in Plaintiff's RRL placement in violation

of all mandates of DC-ADM 802. All either directly participated or approved of Plaintiff's illegal confinement on RRL without Due Process of Law. These defendants further maliciously continued Plaintiff on Disciplinary Custody instead of Administrative Custody as an RRL prisoner in violation of state law 37 Pa Code 93.11, and a created liberty interest as guaranteed by the Fourteenth Amendment to the United States Constitution.

77. Defendant Fonder intentionally minimized Plaintiff's mental health diagnosis and refused to give a medical recommendation for non-medical reasons, with the foreseeable results of serious mental harm was in violation of the Eighth Amendment to the United States Constitution.

28. Defendant MHM engaged in a custom and practice encouraging its employees to turn a blind eye and deaf ear to issues that are detrimental to the mental well being of its patients amounting to deliberate indifference in violation of the Eighth Amendment to the United States Constitution.

## VI. Relief

79. A declaratory judgment that the acts complained of herein violated the Fourth, Eighth and Fourteenth Amendments to the United States Constitution. A declaratory judgment that state law, 37 Pa Code 93.11, was violated by defendants.

80. A permanent injunction barring Plaintiff from being placed back in the SMU at Fayette. A permanent injunction enjoining Defendants from placing the mentally ill in the SMU. A preliminary/permanent injunction affording Plaintiff Due Process of Law in concern to his RRL placement. A preliminary/permanent injunction prohibiting Defendants from continuing to violate 37 Pa Code 93.11 in concern to his improper classification of Disciplinary Custody.

81. An award of compensatory damages as to each claim raised.

82. An award of substantial punitive damages as to each claim raised.

80. An award of court costs and attorney fees.

84. Any other relief this Honorable Court may deem just and proper.

## VERIFICATION

I, Corey Bracey, verify under the penalty of perjury that everything herein contained is true and correct to the best of my personal knowledge, information, and/or belief.

DATE: February 11, 2013

Corey Bracey, Pro Se Plaintiff
P.O. Box 999, 1120 Pike Street
Huntingdon, PA 16652

(17)