IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

COREY BRACEY,

                           Plaintiff,

        vs.

GOVERNOR RENDELL;
COMMONWEALTH OF
PENNSYLVANIA; PA DEPT OF
CORRECTIONS; SECRETARY
JEFFERY BEARD; DIRECTOR
BUREAU OF TREATMENT SERVICES
ANDREA MEINTEL; DIRECTOR OF
BUREAU OF HEALTH CARE; DEPUTY
SECRETARY FOR RE-ENTRY AND
SPECIALIZED TREATMENT
SERVICES; DEPUTY SECRETARY
FOR WESTERN REGION BARRY
JOHNSON; SUPERINTENDENT
COLEMAN; DEPUTY
SUPERINTENDENT FACILITY
MANAGEMENT GATES; DEPUTY
SUPERINTENDENT CENTRALIZED
SERVICES ARNELL; MAJOR ZAKEN;
UNIT MANAGER WALKER;
COUNSELOR BUSTASS; CAPTAIN
BERRIER; CAPTAIN TREMPUS;
CORR OFFICER 1 COLLINS; CORR
OFFICER 1 CAMPBELL; CORR
OFFICER 1 ROLL; LIEUTENANT
TIFT; NURSE HANCOCK; DEPUTY
SUPERINTENDENT CENTRALIZED
SERVICES BRYANT; DEPUTY
SUPERINTENDENT FACILITY
MANAGEMENT HALL; CORRECTIONS
CLASSIFICATION PROGRAM
MANAGER WOODS; DEPUTY
SUPERINTENDENT FACILITY
MANAGEMENT HANNAH;
CORRECTIONS CLASSIFICATION
PROGRAM MANAGER BISER;
SUPERINTENDENT FISHER;
HEARING EXAMINER McKOSSICK;

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

) Civil Action No. 11-217E

) Judge Cathy Bissoon/
) Magistrate Judge Maureen P. Kelly

) Re: ECF Nos. 114 and 118

HEARING EXAMINER MITCHELL;          )
DR. SAVADRA; DR. FONDER; MHM          )
CORRECTIONAL SERVICES, INC.; DR.          )
GALLUCCI; CAPTAIN LEGGET,          )
                         Defendants.          )

## REPORT AND RECOMMENDATION

## I.     RECOMMENDATION

Corey Bracey ("Plaintiff"), is a prisoner in the custody of the Pennsylvania Department of Corrections ("DOC"), and is currently incarcerated at the State Correctional Institution ("SCI") at Smithfield.  Plaintiff has brought this civil rights action against various DOC and health care employees at four different correctional institutions alleging that the manner in which prisoners with mental health issues are housed at SCI Fayette, his confinement in an observation cell at SCI Fayette and his classification on the Restricted Release List ("RRL") at the various institutions, violate his rights provided by the Fourth, Eighth and Fourteenth Amendments to the United States Constitution.

Presently before the Court is a Motion for Summary Judgment submitted by Defendants Beard, Meintel, Ellers, Gnall, Johnson (all of whom are DOC officials); Coleman, Gates, Arnell, Zaken, Walker, Bustass, Berrier, Leggett, Gallucci (all of whom are employed at SCI Fayette); Bryant, Hall, Woods (all of whom are employed at SCI Albion); Hannah, Biser, Fisher, Whietsel (all of whom are employed at SCI Smithfield) (collectively, "the Commonwealth Defendants"), and a Motion for Summary Judgment of Defendants Saavedra, Fonder, and MHM Correctional Services, Inc. ("the Medical Defendants").  ECF Nos. 114, 118.  For the reasons that follow, it is respectfully recommended that both Motions for Summary Judgment be granted.

## II.    REPORT

### A.    Factual and Procedural Background

Review of the record demonstrates that Plaintiff arrived at SCI Fayette on December 4, 2008, ECF No. 117-1, p. 61, and was immediately placed in the Restricted Housing Unit ("RHU"). The RHU is "Level 5" housing where inmates in disciplinary custody ("DC") and administrative custody ("AC") are located. ECF No. 131-1, p. 11. Although not entirely clear from the record, it appears that Plaintiff was in DC at that time and, other than a brief period between January 14, 2009 and June 4, 2009, when Plaintiff was in the general population, he has largely remained in DC throughout his incarceration. See ECF No. 117-1, pp. 59, 61; ECF No. 131-1, pp. 53, 65.

Level 5 housing apparently includes two special housing units as well: the Special Management Unit ("SMU") and the Secure Special Needs Unit ("SSNU"). ECF No. 75, pp. 6-7, 28; ECF No. 117-1, pp. 14, 17, 42; ECF No. 131-1, p. 3. The former is designed for offenders who have chronic and serious behavioral issues not driven by a diagnosed mental illness and, in that regard, is similar to the RHU. ECF No. 117-1, pp. 13, 19, 22, 42, 45, 49; ECF No. 131-1, pp. 6, 9, 11, 13, 15, 26, 29. In contrast, the SSNU "is specifically designed for mentally ill offenders who exhibit serious behavioral issues determined to be linked to their mental illness." Id. Thus, the approach to behavioral change in the SMU and SSNU programs differ and, although both are staffed by mental health professionals, the staff sees the SSNU inmates more frequently than those in the SMU. ECF No. 131-1, pp. 29, 30. Although it is unclear from the record precisely when or for how long, it appears that Plaintiff was in the SMU and/or a self-contained camera observation cell on several occasions. See ECF No. 75, ¶¶ 36, 44, 45, 47, 48,

56-59; ECF No. 131-1, pp. 30, 53.  The record shows, however, that Plaintiff was not confined to the self-contained cell for mental health reasons but rather was on a "security hold."  ECF No. 119, ¶ 3; ECF No. 119-1, p. 45; ECF No. 134, ¶ 3.

In addition, it appears that toward the end of his incarceration at SCI Fayette, Defendant Walker recommended that Plaintiff be placed on the Restricted Release List ("RRL").[1]  ECF No. 75, ¶ 60.  It appears that the recommendation was again made when Plaintiff was transferred to SCI Albion on June 29, 2010, and approved by Defendants Johnson and Smeal at that time.  ECF No. 75, ¶¶ 61-63.  Although placement on the RRL was approved, and that approval appears to have remained in effect even though Plaintiff has since been transferred to SCI Smithfield, ECF No. 75, ¶ 69, it does not appear from the record that he has ever actually been released from DC so as to permit his placement on the RRL to be of consequence.  ECF No. 131-1, p. 65. Nevertheless, these various housing units and Plaintiff's placement on the RRL provide the basis for his claims.

Plaintiff initiated this suit on September 22, 2011, see ECF No. 1, and the Complaint was filed on November 3, 2011.  ECF No. 9.  Plaintiff filed an Amended Complaint on February 27, 2012, ECF No. 20, and a second Amended Complaint ("the Second Amended Complaint"), ECF No. 75, on April 25, 2013.  In the Second Amended Complaint, which remains the operative complaint, Plaintiff brings claims for violations of his rights provided by the Eighth and Fourteenth Amendments to the United States Constitution relative to the housing of SSNU, SMU

---

[1] The RRL is a list upon which an inmate's name is placed "when he/she poses a threat to the secure operation of the facility;" and requires approval by the Secretary of Corrections before the inmate may be released back into the general population.  Washington-El v. Beard, 2013 WL 1314528, at *9 (W.D. Pa. Feb. 26, 2013), *Report and Recommendation adopted as modified on other grounds by* 2013 WL 1314521 (W.D. Pa. Mar. 28, 2013), *aff'd*, ___ F. App'x ___, 2014 WL 1064520 (Mar. 20, 2014).

and RHU prisoners and the allegedly "clandestine" mental health treatment of non-mentally ill inmates at SCI Fayette. Plaintiff has also brought claims under the Fourth and Eighth Amendments relative to his confinement in a self-contained cell while at SCI Fayette, and Fourteenth Amendment claims relative to his alleged illegal classification on the RRL which has followed him from SCI Fayette to SCI Albion to SCI Pittsburgh.

The Commonwealth Defendants filed a Motion for Summary Judgment on January 8, 2014, to which Plaintiff responded on April 15, 2014. ECF Nos. 114, 131. The Medical Defendants filed a Motion for Summary Judgment on January 9, 2014, and Plaintiff filed a response to the Medical Defendants' Motion on April 15, 2014. ECF Nos. 118, 133. On May 27, 2014, the Medical Defendants filed a reply brief and Plaintiff submitted a Cross-reply to the Medical Defendants' Motion on June 11, 2014. ECF Nos. 135, 137. As such, both Motions are ripe for review.

## B.    Standard of Review

Rule 56 of the Federal Rules of Civil Procedure provides that: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). See Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007), *quoting* Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). See Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007), *quoting* Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. New Jersey Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

### C. Discussion

Plaintiff has brought his claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides that:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any rights, privileges, or
> immunities secured by the Constitution and laws, shall be liable to the party

injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "Section 1983 provides remedies for deprivations of rights established in the Constitution or federal laws. It does not, by its own terms, create substantive rights." Kaucher v. Cnty. of Bucks, 455 F.3d 418, 423 (3d Cir. 2006), *citing* Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979) (footnote omitted). Thus, in order to state a claim for relief under Section 1983, the plaintiff must allege facts from which it could be inferred that "the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States." Id. at 423. As previously discussed, Plaintiff in this case alleges that his rights provided by the Fourth, Eighth and Fourteenth Amendments to the Constitution have been violated.

### 1. The Commonwealth Defendants' Motion for Summary Judgment

#### a. Eighth Amendment - Conditions of Confinement

Plaintiff brings claims against Defendants Beard, Meintel, Ellers, Gnall, Coleman, Gates, Arnell, Zaken, Walker, Bustass, and Gallucci complaining that unconstitutional housing conditions at SCI Fayette have caused Plaintiff's mental health to deteriorate. ECF No. 75, ¶ 73. Specifically, Plaintiff alleges that inmates assigned to the RHU, SMU and SSNU are all housed together in violation of policy and/or law; that, consequently, SSNU prisoners do not receive treatment causing them to "act out;" and that their acting out has, in turn, caused Plaintiff to have a mental breakdown. Id.

To make out an Eighth Amendment claim based on prison conditions, the plaintiff must show "he has suffered an objectively, sufficiently serious injury, and that prison officials inflicted the injury with deliberate indifference." Farmer v. Brennan, 511 U.S. 825, 834 (1994). With

respect to the first element, the conditions complained of must be "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities." Id. at 834 (internal citation and quotation omitted). See Hudson v. McMillian, 503 U.S. 1, 9 (1992), *quoting* Rhodes v. Chapman, 452 U.S. 337, 347 (1981), *and* Wilson v. Seiter, 501 U.S. 294, 298 (1991) ("[b]ecause routine discomfort is 'part of the penalty that criminal offenders pay for their offenses against society,' . . . 'only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation'"). A plaintiff must prove that the deprivation is sufficiently serious when viewed within the context of "contemporary standards of decency." Helling v. McKinney, 509 U.S. 25, 36 (1993).

With respect to the second element, a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837. Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it. A trier of fact may infer the existence of this subjective state of mind from the fact that the risk of harm is obvious. Id. at 842. See Okey v. Strebig, 531 F. App'x 212, 214-15 (3d Cir.), *cert. denied*, ___ U.S. ___, 134 S. Ct. 446 (2013).

The Commonwealth Defendants contend that Plaintiff's claim regarding the housing of various Level 5 inmates together is subject to summary judgment because there is no evidence

that RHU, SMU and SSNU prisoners are actually housed together or that there is a policy either permitting or barring their being housed together. Defendants further argue that even if a policy exists, any failure to follow the policy does not rise to the level of a constitutional violation and that there is no evidence that the SSNU prisoners are not receiving adequate mental health care or that their actions caused the deterioration of Plaintiff's mental health.

Although it is not clear from the record whether or not RHU, SMU and SSNU prisoners are housed together at SCI Fayette, there does not appear to any specific policy that prohibits such housing.[2] These issues, however, are immaterial as Plaintiff has failed to point to any evidence from which a fact finder could conclude that SSNU inmates, even if housed with SMU inmates, were not receiving treatment or that the failure to get treatment caused them to act out. Nor has Plaintiff pointed to any evidence that the SSNU inmates' behavior caused or contributed to his alleged mental breakdown. The only evidence that Plaintiff has provided to support his contention that SSNU prisoners are not being treated is a statement by Defendant Gnall that

---

[2] See ECF No. 117-1: p. 13 (SSNU are separate from SMU); p. 19 ("SSNU inmates should not be placed in SMU programming;" Defendant Ellers is not aware of any specific policy that either permits or prohibits housing of various level 5 inmates together); pp. 42-43 (SSNU and SMU are both programs with specialized treatment services; Defendant Meintel is not aware of any specific policy that either permits or prohibits housing of various level 5 inmates together; the purpose of SMU is to securely house inmates who exhibit behavior that is continually disruptive, violent and dangerous while the SSNU is designed to provide inmates with mental health issues the opportunity for specialized treatment); p. 44 ("SSNU inmates are not housed in the SMU program because they are not approved to be housed there"); p. 47 (the SMU and SSNU is not a classification they are both programs"); p. 50 ("Both SMU and SSNU inmates were housed together in the L Block if both were aggressive. This occurred with SSNU even though they had psychiatric histories"); p. 51 ("SSNU inmates should not be housed in SMU programming because their mental illness could prohibit their ability to progress through such programming"); ECF No. 131-1: p. 3 ("Restricted Housing Unit ... houses SMU, SSNU and AC/DC inmates"); pp. 5-6 ("Mentally-ill offenders who act out in the SMU may be transferred to the SSNU's where they receive additional psychiatric, psychological ... services"); p. 15 (SMUs are special units within designated facilities, separate from an RHU); p. 56 ("[t]he SMU is a special unit for highly disruptive inmates which provides additional controls for staff and inmate safety"). See also ECF No. 131-1, pp. 8, 9, 11, 13. The Court also notes here that while Plaintiff was in the MHU at SCI Cresson, where he was confined from April 23, 2010 to May 13, 2010, Plaintiff complained of anxiety about being returned to the SMU at SCI Fayette, stating that he wanted to return to the RHU. ECF No. 119-4, p. 44. If, as Plaintiff contends, the SMU, RHU and SSNU prisoners are all housed together, it would seem unnecessary to have made the distinction.

9

"[m]entally-ill offenders exhibiting behavioral issues require different approaches to behavioral change than those offenders who [sic] behavior is unrelated to mental illness. The SMU and SSNU programs are designed and staffed by mental health professionals," and statements by Defendant Gallucci that psychologists and psychiatrists visit SSNU inmates more frequently and that inmates with mental health issues "should not be housed in SMU programming because their mental illness could prohibit their ability to progress through such programing." ECF No. 131-1: p. 29, ¶ 8; p. 30, ¶¶7, 8. None of these statements, however, provide the basis for concluding that mentally ill or SSNU inmates are not receiving treatment. Rather, they indicate only that SSNU inmates require a different "program" because they would have difficulty progressing through the SMU program and that they are seen more frequently by mental health professionals. See ECF No. 117-1, p. 47 ("[t]he SMU and SSNU is not a classification they are both programs").

Nor do the statements submitted by Gall and Gallucci provide the basis for finding that being housed in the SMU has caused mentally ill inmates to act out or that their allegedly disruptive conduct caused Plaintiff's mental health to deteriorate. Although Plaintiff has submitted Defendant Berrier's Response to Interrogatories in which he states that prisoners on L block smear their own feces on the walls, windows and cameras in the cells, nothing about Berrier's response indicates that prisoners housed on L block smear feces because they are not receiving treatment. Moreover, it cannot be disputed that inmates other than those with mental illnesses smear feces in their cells. Plaintiff's failure to demonstrate that it is only the mentally ill inmates who smear feces in their cells precludes a finding that feces are smeared because of the lack of mental health care. Furthermore, the fact that some inmates smear feces on the walls of their cells, whether mentally ill or not, does not, without more, give rise to an unconstitutional

condition of confinement. Plaintiff does not specifically allege that he was anywhere near the SSNU prisoners nor provided any evidence regarding where he was housed in relation to the SSNU prisoners. Nor does Plaintiff allege or provide evidence that his cell was smeared with feces, that he was in anyway exposed to the feces or unsanitary conditions, or that Defendants failed to address the situation when it arose. See Farmer v. Brennan, 511 U.S. at 838.

Plaintiff has also failed to provide evidence that his being housed in the SMU caused his mental health breakdown. The only evidence Plaintiff points to as supporting his claim is a psychiatric evaluation conducted by Dr. Marlena Roman at SCI Albion in July of 2010, wherein she notes "[a]cute onset of depressed mood, anorexia -- occurring in the context of SMU housing/prospects of prolonged disciplinary custody -- consistent with adjustment disorder and depressed mood." ECF No. 119-1, p. 35. Contrary to Plaintiff's assertion, however, Dr. Roman does not state that Plaintiff's mental health condition was the result of being housed with mentally ill inmates or because those inmates "acted out." Rather, Dr. Roman attributes Plaintiff's onset of depression to being confined in segregated housing in the SMU -- where Plaintiff was placed because of own behavioral and disciplinary problems -- and because of the prospect that his stay there would be prolonged. See ECF No. 117-1, p. 42 ("[t]he primary purpose of the SMU is to securely house an inmate who exhibits behavior that is continually disruptive, violent and dangerous, or a threat to the orderly operation of his/her assigned facility"); ECF No. 131-1, p. 6 ("the SMU's are designed for offenders who do not have mental illness but are chronic, serious behavioral issues in prisons. Most SMU offenders have been assaultive and receive multiple, serious misconducts . . ."). See also ECF No. 117-1, p. 16 (noting Plaintiff's history of assaults and manipulation). Dr. Roma's assessment, therefore, does

not permit the inference that Plaintiff's breakdown was the result of the conduct of mentally ill inmates.

### b. Eighth Amendment - Conditions of Confinement/Fourteenth Amendment - Due Process

On July 11, 2011, Dorina Varner, the Chief Grievance Officer at SCI Albion, where Plaintiff was incarcerated at the time, issued a Final Appeal Decision upholding the denial of a grievance Plaintiff had filed. Therein, Ms. Varner states, "[y]ou have a long history of SMU placement. SMU is a program that attempts to involve inmates and motivate them to participate in mental health treatment, which shows that you have been participating in treatment all along." ECF No. 131-1, p. 53. Based on this statement and Defendant Beard's Answers to Interrogatories in which he states that "[t]he SMU is a special unit for highly disruptive inmates which provides additional controls for staff and inmate safety and where staff work with the inmates to try to restore them to a more normal level of functioning with the goal being an eventual return to general population," and that "[t]he SMU is a 'behavior driven program,' meaning the inmate is held responsible for poor behavior," Plaintiff alleges that the SMU at SCI Fayette is being covertly operated as an experimental housing unit in which mental health treatment, *i.e.*, behavior modification, is being forced on non-mentally ill inmates without due process.[3] Plaintiff also complains that the behavior modification techniques used at SCI Fayette to involuntarily treat SMU inmates include the denial of food, showers and exercise and "beatings," ECF No. 131, p. 2, and thus violate the Eighth Amendment. Plaintiff also contends that Defendants Beard, Meintel, Ellers, Gnall, Coleman, Gates, Arnell, Zaken, Walker, Bustass

---

[3] It does not escape the Court that Plaintiff has simultaneously alleged that treatment is being forced on inmates without mental health issues and that no treatment is being provided to inmates who do.

and Gallucci were aware of and approved the violations. ECF No. 75, ¶¶ 45, 74; ECF No. 131, pp. 2, 8-9.

As set forth above, to establish an Eighth Amendment violation based on conditions of confinement, the plaintiff must show that he has suffered an objectively, sufficiently serious injury and that prison officials inflicted the injury with deliberate indifference. <u>Farmer v. Brennan</u>, 511 U.S. at 834. Plaintiff, however, has not provided the Court with any evidence that inmates in the SMU are denied food, showers or exercise or that they are beaten. Rather, Plaintiff's evidence shows only that the SMU is a program that offers psychological services to inmates who have serious and chronic behavioral problems; that the program provides inmates with an opportunity to return to the general population and "is designed to provide an inmate access to the same shower and exercise opportunities as the other RHU inmates;" that the staff in the SMU "works with the inmates to restore them to a more normal level of functioning;" and that the SMU "is a 'behavior driven program,' meaning the inmate is held responsible for poor behavior." ECF No. 131-1, pp. 6, 8, 9, 11, 13, 26, 28, 29, 40, 50-51, 56, 57. These facts fall woefully short of demonstrating conditions of confinement that run afoul of the Eighth Amendment or that Plaintiff has suffered a serious injury as a result.

Plaintiff's Fourteenth Amendment claim in this regard fails as well. The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1. To establish a claim under the Due Process Clause, a plaintiff must show that he had a protected liberty or property interest of which he has been deprived, and that the process afforded him did not comport with constitutional requirements. <u>Shoats v. Horn</u>, 213 F.3d 140, 143 (3d Cir. 2000).

With respect to the first inquiry, it is well established that that the Due Process Clause of the Fourteenth Amendment does not create an inherent liberty interest to remain free from administrative segregation.  Hewitt v. Helms, 459 U.S. 460, 468 (1983), *overruled on other grounds by* Sandin v. Connor, 515 U.S. 472 (1995); Stephany v. Wagner, 835 F.2d 497, 499 (3d Cir. 1987) ("the Due Process Clause does not give a prisoner a liberty interest in remaining in the general prison population").  See McKune v. Lile, 536 U.S. 24, 39 (2002) ("[i]t is well established that the decision where to house inmates is at the core of prison administrators' expertise").  Although a state government "may under certain circumstances create liberty interests which are protected by the Due Process Clause, the United States Supreme Court has held that, in the state prison context, changes in conditions of an inmate's confinement can result in the deprivation of a constitutionally protected liberty interest only where the liberty interest involved is one of "real substance," or where the change results in an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin v. Conner, 515 U.S. at 477, 484-487.

In this case, it should be noted at the outset that the grievance to which Ms. Varner responded on July 11, 2011, was filed by Plaintiff at SCI Albion and not at SCI Fayette where Plaintiff claims the SMU is being covertly operated.  Ms. Varner, therefore, was necessarily referring to the SMU at SCI Albion in her Final Appeal Decision and not SCI Fayette.  Assuming, however, that all the DOC's SMU programs maintain the same goals and implement the same procedures, neither Plaintiff's confinement in the SMU nor the behavior modification program provided to SMU inmates implicate a liberty interest in the first instance as they do not impose an atypical and significant hardship on Plaintiff or any other inmates.  See Okey v.

Strebig, 2012 WL 5439042, at *5 (M.D. Pa. Nov. 7, 2012), *aff'd*, 531 F. App'x 212 (3d Cir.

2013) ("this Court has repeatedly held that placement of Pennsylvania inmates in the [DOC]'s

Restricted Housing Unit ('RHU') or Special Management Unit ('SMU') does not implicate their

liberty interests").  Moreover, contrary to Plaintiff's assertion, the record shows that the SMU

inmates are not forced to undergo any treatment but that the program merely "attempts to . . .

motivate them" to modify the disruptive and manipulative behavior that precipitated their

confinement in the SMU thereby giving them an "opportunity to return to the general

population."  ECF No. 117-1, pp. 13, 42; ECF No. 131-1, pp. 13, 53, 56.  Accordingly, due

process has not been implicated and Defendants are entitled to summary judgment with respect

to Plaintiff's claim of forced and experimental mental health treatment.

c.      **Eighth Amendment - Conditions of Confinement/Fourth Amendment - Bodily Integrity**

Plaintiff also alleges that in September of 2009, following an altercation on J Block of the

RHU at SCI Fayette, he was taken to the SMU and placed in "a camera observation self-

contained cell," which was authorized by Defendants Coleman, Zaken and Leggett, and that he

remained there for eight months.[4]  ECF No. 75, ¶¶ 35-36, 75.  Plaintiff claims that the in-cell

camera was constantly recording; that he was "totally isolated, rarely having to exit the cell;" that

in the winter months the cell was unbearably cold; and that "[p]rivacy when using the bathroom

or any other act of modesty was non-existent," thereby contributing to his alleged mental

breakdown in violation of his rights provided by the Fourth and Eighth Amendments to the

---

[4] A self-contained cell apparently has a shower inside the cell and a door which exits into a small private yard area.  ECF No. 131-1, p. 42.

Constitution.  Id. at ¶¶ 37, 75.  Plaintiff also claims that his confinement in the self-contained cell, and thus the violation of his constitutional rights, was "succeeded" by Defendants Berrier and Walker.  Id. at ¶ 36.

As previously discussed, to make out an Eighth Amendment claim based on prison conditions, the plaintiff must show that the conditions complained of are "objectively, sufficiently serious [and] must result in the denial of the minimal civilized measure of life's necessities" and that the prison official knows that the inmate face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it.  Farmer v. Brennan, 511 U.S. at 834.

In the instant case, although Plaintiff alleges in the Second Amended Complaint that he was isolated and that his cell was unbearably cold, he has not specifically addressed Defendants' arguments that summary judgment in this regard is warranted as to these claims other than to note Defendant Beard's statement that "[l]ongterm use of the self-contained cells for shower/exercise greatly reduces staff/inmate interaction which is not conducive to rehabilitation goals."  ECF No. 131-1, p. 51.  Plaintiff, however, does not suggest how his rehabilitative goals were impacted or provided the Court with any evidence to suggest that he suffered an "extreme deprivation."  See Hudson v. McMillian, 503 U.S. 1, 8-9 (1992) (only "extreme deprivations" are sufficient to make out a conditions of confinement claim).   More specifically, Plaintiff does not provide evidence indicating how often was he permitted out of his cell; how often he interacted with staff members; what specific effect the isolation had on him; how cold his cell was; how many hours of the day it was cold; or what effect the cold had on him.  Further, Plaintiff does not provide any evidence whatsoever, that any of the Defendants were aware of the fact, or drew the

inference, that Plaintiff's cell was cold or that his mental health was suffering as a result of the cold and/or isolation. See Burkholder v. Newton, 116 F. App'x 358, 363 (3d Cir. 2004) (noting that Eighth Amendment claims have been rejected when much harsher conditions than a cold and unsanitary cell have been alleged and that the plaintiff nevertheless failed to allege that he complained about the conditions or that the defendants acted with deliberate indifference); Iverson v. Leggett, 2013 WL 3972621, at *12 (W.D. Pa. July 30, 2013) (finding that the plaintiff's failure to adduce any evidence regarding the temperature of his cell or that the defendants knew that the plaintiff was cold and disregarded his complaints was fatal to his claim). As such, no reasonable fact finder could conclude that Plaintiff's confinement in a self-contained cell violated his Eighth Amendment rights and the claim is properly dismissed.[5]

Defendants also argue that they are entitled to summary judgment on Plaintiff's Fourth Amendment claims because inmates are routinely viewed in the nude while taking showers, during strip searches and certain cell extractions, and that such limited viewing of an inmate does not constitute a constitutional violation.

Plaintiff raised a virtually identical claim in another case before this Court which was rejected on the basis that:

> The United States Constitution does not mandate that prisons which house prisoners convicted of serious crimes must be completely free of discomfort and affronts to a prisoners' dignity. *See Rhodes v. Chapman*, 452 U.S. 337, 349 ... (1981). Consequently, a prisoner's right of privacy exists only so far as it is not fundamentally inconsistent with prisoner status or incompatible

---

[5] Out of an abundance of caution, Defendants have also addressed Plaintiff's allegation in the Second Amended Complaint that he found crushed glass in his food while confined in the SMU. ECF No. 75, ¶ 38. As Defendants speculate, however, this claim was already dismissed from the action pursuant to Defendants' earlier filed Motion to Dismiss and thus will not be addressed here. See ECF Nos. 37, 39. Notably, Plaintiff has not addressed the issue in his responsive brief either.

> with the legitimate objects of incarceration. *Pell v. Procunier*, 417 U.S. 817, 822 (1974). Similarly, the state may restrict or withdraw a prisoner's rights to the extent necessary to further the correctional system's legitimate goals and policies. *Hudson v. Palmer*, 468 U.S. 517, 524 ... (1984); *Bell v. Wolfish*, 441 U.S. at 545–46. Institutional security has been recognized as chief among the state's legitimate goals. *Hudson v. Palmer*, 468 U.S. at 524; *Bell v. Wolfish*, 441 U.S. at 547–48. Occasional viewing of inmates while showering or using toilet facilities has been held to be appropriately within the parameters of maintaining institutional security and therefore, constitutional.

Bracey v. Price, C.A. No. 2:09-cv-1662, 2012 WL 6015727, at *17-18 (W.D. Pa. Dec. 3, 2012).[6]

Plaintiff nevertheless contends that his subsequent confinement in the self-contained cell in September of 2009 differs from the first confinement when he first arrived at SCI Fayette because he was under constant observation and not just viewed on "occasion." Plaintiff, however, has produced no evidence to support his assertion. The only evidence cited by Plaintiff is Defendant Leggett's Answers to Interrogatories in which he states that the cameras in the self-contained cells are always on; that the cameras record what is going on in the cell; that "real-time" occurrences can be viewed from other monitors in the institution; and that the control booth is constantly manned. ECF No. 131-1, pp. 38-42. Noticeably lacking is any evidence that any one monitor is constantly focused on Plaintiff's cell or that the Control Booth staff is viewing that particular monitor at all times. While it may be that the cameras are always on, and the Control Booth is always manned, it does not necessarily follow that Plaintiff is being viewed 24/7. Indeed, Defendant Berrier has represented that although the Control Booth is manned 24/7,

---

[6] In Bracey v. Price, C.A. No. 2:09-cv-1662, Plaintiff alleged that Defendants Leggett and Lesure had him placed in an observation cell upon his arrival to SCI Fayette where the in-cell camera observed him 24/7; that he was viewed in the nude while showering, using the toilet and any other act of privacy; and that the cell was tortuously cold. C.A. No. 2:09-cv-1662, ECF No. 35, ¶¶ 49, 51, 52, 53.

18

the monitors are not. ECF No. 117-1, p. 46; ECF No. 131-1, p. 34. Given the fact that there are "hundreds of cameras at SCI Fayette," the likelihood that Plaintiff is being constantly watched is remote at best. See ECF No. 131-1, pp. 42. Further, Plaintiff has not provided any evidence that he has any less privacy showering in the self-contained cell than he would have in the communal showers where he would be seen by staff members as well as other inmates, or that anyone has ever viewed any of the recordings made of him in his cell. Plaintiff therefore is unable to establish a Fourth Amendment violation in this regard and Defendants are entitled to summary judgment.

### d. Fourteenth Amendment - Due Process

Plaintiff brings due process claims against Defendants Smeal, Johnson, Coleman, Gates, Arnell, Zaken, Walker, Bustass, Bryant, Hall, Woods, Hannah, Whietsel, Biser and Fisher alleging that his initial placement on the RRL and his continued placement on the RRL at SCI Albion and SCI Smithfield violate his rights provided by the Fourteenth Amendment.[7] ECF No. 75, ¶ 76. The record, however, does not support Plaintiff's claims.

As previously discussed, the Due Process Clause of the Fourteenth Amendment does not create an inherent liberty interest to remain free from administrative segregation. See Hewitt v. Helms, 459 U.S. at 468. Conditions of an inmate's confinement can result in the deprivation of a

---

[7] Because Plaintiff has alleged in the Second Amended Complaint that Defendant Walker orchestrated Plaintiff's placement on the RRL because Walker did not like Plaintiff's "gripes," see ECF No. 75, ¶¶ 58-60, Defendants have construed Plaintiff's claim as a First Amendment retaliation claim. However, after careful review of the Second Amended Complaint and Plaintiff's response to Defendants' Motion for Summary Judgment, the Court finds that Plaintiff's claim is more appropriately considered as one brought under the Fourteenth Amendment's Due Process Clause.

constitutionally protected liberty interest only where the conditions result in "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. at 477, 484-487. This Court has specifically held that placement on the RRL does not constitute an atypical and significant hardship and therefore "does not implicate a constitutionally protected due process right." Washington-El v. Beard, 2013 WL 1314528, at *9. Rather, "the RRL is simply '[a] list of inmates who are restricted from release from AC status without the prior approval of the Secretary [or his] designee. An inmate may be placed on this list when he/she poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern.'" Id. (citation omitted). Moreover,

> [Both] RRL and non-RRL inmates have their custody status periodically reviewed by the [Program Review Committee]. Non–RRL inmates can be released into general population by the PRC or Superintendent. See DC–ADM 802, Section 4(A). Release of an RRL inmate into general population, however, requires the approval of the Secretary of Correction or his or her designee, though the PRC may recommend release. *See id.* In all other respects, RRL inmates are treated identically to their non-RRL counterparts on AC-status.

Id., *quoting* Leaphart v. Palakovich, 2012 W L 175426, at *3 (M.D. Pa. Jan. 20, 2012). Thus, "placement on the RRL merely adds another layer of review relative to the decision to release an inmate from administrative custody back to general population; it does not involve any added deprivation of liberty as to which due process rights attach." Id., *citing* Bowen v. Ryan, 248 F. App'x 302, 304 (3d Cir. 2007) (affirming dismissal of prisoner's claim that he was placed on the RRL without due process because "[p]lacement on the List did not deprive Bowen of his liberty, privileges, or any other constitutionally protected liberty interest"); Carter v. Beard, 2012 WL

1414446, at *3 (M.D. Pa. April 24, 2012) (noting that the "Third Circuit has held ... that placement on the RRL does not deprive an inmate of a liberty interest triggering due-process protection").

Plaintiff nevertheless contends that he suffered an atypical and significant hardship by being placed on the RRL because the designation barred him from receiving the particular mental health treatment recommended by two psychiatrists and from participating in "Therapeutic Community," a program he must complete in order to be eligible for parole. Because, according to Plaintiff, his inability to complete the Therapeutic Community program effectively extends his sentence, Plaintiff argues that his placement on the RRL constitutes an atypical and significant hardship.

Plaintiff's argument fails for several reasons. First, Plaintiff has provided no evidence that being placed on the RRL prevents him from receiving mental health treatment or from participating in the Therapeutic Community program. Indeed, Plaintiff admits in the Second Amended Complaint that he met with psychologists and psychiatrists after he was placed on the RRL. ECF No. 75, ¶ 71. In addition, to the extent Plaintiff is not receiving the level of treatment recommended or has been unable to participate in the Therapeutic Community program, he has provided no evidence that it is *because* he is on the RRL. As discussed above, being placed on the RRL does not come with any added deprivations but only adds a layer of review before he can be removed from the list. Moreover, it is undisputed that Plaintiff was in Level 5 housing when he was placed in the RRL. He acknowledges, however, that to participate in the Therapeutic Community program an inmate has to be in the general population. ECF No. 131, p. 12. Plaintiff therefore would not be able to participate in the Therapeutic Community program

21

even if he was not on the RRL.  Under these circumstances, no reasonable fact finder could conclude that Plaintiff has suffered an atypical and significant hardship by being placed on the RRL.

Further, the Court in Washington-El v. Beard, 2013 WL 1314528, concluded that because placement on the RRL does not implicate the Fourteenth Amendment, "even if Plaintiff *never* received a separate notice and hearing relative to his placement on the RRL, no due process violation occurred with respect to that particular administrative decision." Id. at *9 (emphasis added).  Accordingly, Plaintiff's complaints that he continued to be placed on the RRL at SCI Albion and SCI Smithfield without due process fails as well.  Moreover, contrary to Plaintiff's present assertion, he has acknowledged in the Second Amended Complaint that he received periodic reviews by the Program Review Committee ("PRC") at both SCI Albion and SCI Smithfield and thus due process has been served.  See Washington-El v. Beard, 2013 WL 1314528, at *8, *citing* Shoats v. Horn, 213 F.3d at 144 ("[i]t is well settled in Pennsylvania that periodic review of inmates indefinitely confined in administrative confinement comports with due process requirements").  Indeed, as argued by Defendants, Plaintiff's claims against Defendants Bryant, Hall, Woods, Hannah, Whietsel and Fisher, are based on their actions during the PRC reviews.  See ECF No. 75, ¶¶ 19-24, 63, 64, 67; ECF No. 131-1, p. 19.  As such, to the extent that Plaintiff was entitled to due process with respect to his placement on the RRL, he received all the process that was due and Defendants are entitled to summary judgment.

The Court notes here that to the extent Plaintiff claims he was denied due process by being "illegally classified" as being in DC while on the RRL because RRL status is an AC classification, his claim also fails.  Plaintiff has not pointed to any evidence that he was classified

as DC while on the RRL. To the contrary, the record -- indeed, Plaintiff's own exhibit -- shows that he would remain on DC, which is more restrictive than and takes precedence over AC, until his sanction was "complete" and then he would "revert to RRL on AC." ECF No. 131-1, pp. 11, 65. It therefore is evident that Plaintiff was not effectively on the RRL when he was in DC.[8] Second, as already discussed, Plaintiff received all the process he was due having had periodic reviews by the PRC. Defendants therefore are entitled to summary judgment on Plaintiff's due process claims with respect to his alleged illegal classification.

The Court also notes that although Plaintiff claims in his responsive brief that his placement on the RRL constitutes an Eighth Amendment violation in that it amounts to indefinite solitary confinement and because he is unable to receive the recommended mental health treatment, he has not raised an Eighth Amendment claim in this regard in his Second Amended Complaint and thus may not do so here. Bell v. City of Phila., 275 F. App'x 157, 160 (3d Cir. 2008) ("[a] Plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment"). Nevertheless, Plaintiff's acknowledgment that he received mental health care following his placement on the RRL precludes a finding that Defendants have been deliberately indifferent to Plaintiff's mental health care needs. Indeed, this Court has already found in yet another of Plaintiff's cases that the mental health care Plaintiff received at SCI Albion was constitutionally sound having been "treated by psychology staff no fewer than thirty-one times during the period between August 4, 2010 through May 13, 2011 . . . and [having] had access to a Psychologist who makes daily rounds in the RHU." Bracey v. Pa.

_____

[8] Notably, Plaintiff does not challenge the basis for his DC status but complains only that he should not be classified as DC when on the RRL.

Dep't of Corrections, C.A. No. 1:11-cv-04, 2012 WL 1825828, at *2 (W.D. Pa. May 18, 2012) (internal quotations and citations omitted). The Commonwealth Defendants therefore are entitled to summary judgment on any Eighth Amendment claim revolving around Plaintiff's placement on the RRL as well.

### 2. The Medical Defendants' Motion for Summary Judgment

Plaintiff brings claims against Defendants Dr. Saavedra, Dr. Fonder and MHM alleging that their conduct relative to Plaintiff's medical care violated his rights provided by the Eighth Amendment.

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to provide basic medical treatment to those whom it has incarcerated and that deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction proscribed by the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 103-04 (1976). Thus, in order to establish an Eighth Amendment violation, a plaintiff must demonstrate: (1) a serious medical need; and (2) that the defendants were deliberately indifferent to that need. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). See Spruill v. Gillis, 372 F.3d 218, 235 (3d Cir. 2004).

In order to establish deliberate indifference, a "plaintiff must make an 'objective' showing that the deprivation was 'sufficiently serious,' or that the result of defendant's denial was sufficiently serious. Additionally, a plaintiff must make a 'subjective' showing that defendant acted with a 'sufficiently culpable state of mind.'" Montgomery v. Pinchak, 294 F.3d 492, 499 (3d Cir. 2002), *citing* Wilson v. Seiter, 501 U.S. 294, 298 (1991). That is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of

serious harm exists, and he must also draw the inference." <u>Wilson v. Burks</u>, 423 F. App'x 169,

173 (3d Cir. 2011), *quoting* <u>Farmer v. Brennan</u>, 511 U.S. at 837.  Inconsistencies or differences

in medical diagnoses, short delays unaccompanied by arbitrary or unduly burdensome

bureaucratic procedures, and the refusal to summon the medical specialist of the inmate's choice,

perform tests or procedures that the inmate desires, or to explain to the inmate the reason for

medical action or inaction, however, does not amount to cruel and unusual punishment.

<u>Maqbool v. Univ. Hosp. of Medicine & Dentistry of New Jersey</u>, 2012 WL 2374689, at * 9

(D.N.J. June 13, 2012).  Nor do allegations of negligence or medical malpractice.  <u>See</u> <u>Spruill v.

Gillis</u>, 372 F.3d at 235 (neither claims of medical malpractice nor disagreements regarding the

proper medical treatment are actionable); <u>Rouse v. Plantier</u>, 182 F.3d at 197, *quoting* <u>Estelle v.

Gamble</u>, 429 U.S. at 105 (allegations of negligence and medical malpractice are not sufficient to

establish a Constitutional violation as the "inadvertent failure to provide adequate medical care

cannot be said to constitute 'an unnecessary and wanton infliction of pain' . . .").  As such,

allegations that the inmate was provided with medical care, but the care was "inadequate" fails to

state a cognizable claim.  <u>See</u> <u>Taylor v. Visinsky</u>, 422 F. App'x 76, 78 (3d Cir. 2011).

### a.   Claims against Defendant Saavedra

The only facts that Plaintiff has alleged in the Second Amended Complaint relative to Dr.

Saavedra are that:

> Defendants Dr. Saavedra and Gallucci were the assigned psychiatrist and
> psychology manager at [SCI] Fayette.  Both had SMU and SSNU prisoners
> under their care and were aware that there was no SSNU program for SSNU
> prisoners and the SMU was being operated in contravention of policy and
> established law.  Both were also intelligent to the fact that mandated
> evaluations were not being conducted in the SMU thereby allowing
> prisoners mental stability to go unattended with indifference.  These

defendants were physically present in the SMU to witness the tortious conditions of confinement."

ECF No. 75, ¶ 43.  Plaintiff then concludes that because Dr. Saavedra was in a position to correct the "illegal mixed classification," which purportedly led to Plaintiff's mental breakdown, but chose not to do so, Dr. Saavedra violated Plaintiff's rights under the Eighth and Fourteenth Amendments.  Plaintiff also concludes that Dr. Saavedra's participation in the covert operation of the SMU violated these same rights.  Id. at ¶¶ 73, 74.

To the extent that Plaintiff claims that Dr. Saavedra's actions, or lack thereof, show deliberate indifference to Plaintiff's medical needs, the record is to the contrary as it is replete with references to the medical care that Dr. Saavedra provided to Plaintiff.  Specifically, the records show that Dr. Saavedra saw Plaintiff on September 19, 2009, when he was first sent to the self-contained cell following an altercation with a corrections officer and was not eating because a corrections officer threatened to put glass in Plaintiff's food.  Plaintiff, however, agreed to take a snack bag because it could not be tampered with stating that he was not on a hunger strike.  Dr. Saavedra found no depression, anxiety, auditory or visual hallucinations or paranoia.  Plaintiff was eating and sleeping well; had no suicidal or homicidal thoughts; was pleasant and cooperative; had organized thoughts, was well-groomed; and showed no evidence of a thought disorder.  Dr. Saavedra's diagnoses were "no active mental health issues" for his Axis I assessment, and antisocial personality disorder for Axis II.  Dr. Saavedra noted that Plaintiff would be followed as needed.  ECF No. 119-1, p. 45.

Plaintiff was seen by Dr. Saavedra again on March 5, 2010, when the staff reported that Plaintiff was not eating again.  Plaintiff reiterated that he was not on a hunger strike but was not

eating because they put glass in his food. He asked for a snack bag and told Dr. Saavedra that he

had no suicidal or homicidal thinking. Dr. Saavedra found Plaintiff pleasant and his thoughts

organized. Dr. Saavedra's diagnosis did not change finding that Plaintiff had no active mental

health issues and had antisocial personality disorder. He noted that Plaintiff understood the

consequences of a hunger strike and was not failing to eat because of some delusion or other

mental illness. Id. at p. 46.

On April 15, 2010, Dr. Saavedra saw Plaintiff following a staff report that Plaintiff was

again on a hunger strike. This time Plaintiff told Dr. Saavedra that he was not eating because he

was depressed that he had 18 months of DC time and kept getting misconducts. Dr. Saavedra

found no evidence of psychosis; noted that Plaintiff understood the consequences of not eating;

was alert and oriented times three; and was pleasant and cooperative. Dr. Saavedra diagnosed

Plaintiff with depressive disorder not otherwise specified (NOS) and antisocial personality

disorder, rule out malingering.[9] Dr. Saavedra also noted that Plaintiff refused medication,

understood the consequences of not eating, and appeared competent to make this decision. Id. at

p. 43.

Dr. Saavedra saw Plaintiff again on April 19, 2010, at which time Plaintiff indicated that

he was not eating because he had no appetite since he had been placed in the self-contained cell.

Dr. Saavedra noted that Plaintiff slept most of the day but saw no behavioral problems or

evidence of psychoses or suicidal or homicidal ideation. Dr. Saavedra's diagnosis remained

---

[9] Defendants have represented, and Plaintiff does not dispute, that under the DSM-IV (Diagnostic and Statistical Manual), the phrase "NOS" for "not otherwise specified" is used by psychiatrists when a potential assessment does not strictly meet the diagnostic criteria set forth by the manual for a particular disorder. Thus, a patient who appears to be depressed but does not meet the specific criteria for major depressive disorder might be diagnosed as "depressive disorder NOS." ECF No. 119-6, ¶¶ 8, 9.

depressive disorder NOS and suggested Remeron; Plaintiff declined. Dr. Saavedra stated that he would follow Plaintiff and consider placing Plaintiff in a MHU. Thereafter Dr. Saavedra discussed Plaintiff's case with the Correctional Health Care Administrator and psychologist. Id. at p. 44.

Dr. Saavedra saw Plaintiff again the next day. The staff reported no behavioral problems and that Plaintiff had been lying in bed covered with a blanket all day. Plaintiff refused to be interviewed and continued refusing all medications. Dr. Saavedra's impression was an Axis I depressive disorder, not otherwise specified. Id.

Dr. Saavedra followed up two days later on April 22, 2010. The staff reported no behavioral problems. Although Plaintiff was still depressed, he continued to refuse any psych medication and spent the day lying in bed covered with a blanket. Plaintiff was not eating, but he was taking liquids. He denied being suicidal or homicidal and was pleasant and cooperative with organized thoughts. Dr. Saavedra's assessment was "rule out major depressive disorder" and antisocial personality disorder. Dr. Saavedra planned to follow up and, in fact, did follow up with a transfer to the MHU at SCI Cresson the next day. Id. at p. 41.

Upon Plaintiff's return from the MHU on May 13, 2010, and following a conference call with the staff at SCI Cresson, Dr. Saavedra noted that Plaintiff did well at the MHU and that he had been taking Paxil albeit inconsistently. Dr. Saavedra indicated that he would continue Plaintiff on Paxil. Id. at p. 42.

Dr. Saavedra saw Plaintiff again on May 17, 2010, and noted that Plaintiff's mood was stable, he was eating well and had no evidence of psychosis. Dr. Saavedra again diagnosed

Plaintiff with mood disorder NOS, and severe antisocial personality disorder; he continued Plaintiff on Paxil and was to follow up in one month. Id. at p. 39.

On June 3, 2010, Dr. Saavedra saw Plaintiff in the RHU at Plaintiff's request. At that time Plaintiff complained that he was not sleeping well, felt anxious and easily agitated and that the Paxil made him sick. He denied feeling suicidal or homicidal and was diagnosed with mood disorder NOS and severe antisocial personality disorder. Dr. Saavedra discontinued the order for Paxil and replaced it with 50 mg of Zoloft. Id. at p. 40.

Dr. Saavedra saw Plaintiff again on June 15, 2010, following another altercation with the staff. Plaintiff complained that the corrections officers were trying to kill him, that he had dreams about the guards trying to hurt him, and that he was depressed. Plaintiff denied hearing voices or feeling suicidal or homicidal. Dr. Saavedra noted that Plaintiff was cooperative, though his affect was restricted, and there were no signs of psychosis. Id. at p. 37. Thereafter, on June 29, 2010, Plaintiff was transferred to SCI Albion.

Plaintiff has admitted that Dr. Saavedra provided the above care which precludes a finding that he was deliberately indifferent to Plaintiff's mental health. ECF No. 119, ¶¶ 3-9; ECF No. 134, ¶¶ 3-9. Moreover, Plaintiff has made no showing that Dr. Saavedra was aware of facts from which the inference could be drawn that the conditions in the SMU were contributing to the deterioration of Plaintiff's mental health. Indeed, Plaintiff has not alleged or provided evidence that he ever complained to Dr. Saavedra about the alleged conditions in the SMU, nor do Dr. Saavedra's notes reflect that Plaintiff made any such complaints. More importantly, even if Dr. Saavedra was aware of the conditions of which Plaintiff complains, he has not shown that Dr. Saavedra drew the inference that the conditions were causing Plaintiff's mental health to

decline.  See Farmer v. Brennan, 511 U S. at 837.  Plaintiff therefore is unable to demonstrate that Dr. Saavedra was deliberately indifferent to Plaintiff's mental health care needs.

This having been said, in their Motion for Summary Judgment, Defendants have categorized Plaintiff's claim against Dr. Saavedra as one for failing to intervene -- a categorization with which Plaintiff agrees.  See ECF No. 133, p. 2.

To prevail on a claim under the Eighth Amendment for an alleged failure to intervene, a Plaintiff must establish that the corrections officer failed or refused to intervene when a constitutional violation took place in his or her presence or with his or her knowledge, and that there was a realistic and reasonable opportunity to intervene.  Brown v. Mravintz, 2006 WL 3717417, at *5 (W.D. Pa. Dec. 14, 2006), *citing* Smith v. Mensinger, 293 F.3d 641, 650-51 (3d Cir. 2002).

Here, however, the Court has already found that Plaintiff is unable to establish a constitutional violation in the first instance.  Plaintiff has not only failed to submit any evidence from which a fact finder could conclude that the SSNU inmates, even if they were housed with SMU prisoners, were not receiving treatment or that any lack of treatment caused them to act out, but the record is devoid of any evidence that the SSNU inmates' alleged behavior had any bearing on Plaintiff's metal deterioration.  Having failed to substantiate his underlying conditions of confinement claims, it follows that Dr. Saavedra cannot be found liable for failing to intervene.  See Nifas v. Coleman, 2013 WL 549089, at *15 (W.D. Pa. Feb. 12, 2013) (plaintiff's failure to substantiate his claim of excessive force precludes a finding that a constitutional violation occurred or that defendants can be held liable for failing to intervene); Brown v. Mravintz, 2006 WL 3717417, at * 5 (defendants failure to intervene cannot serve as the basis for

liability under the Eighth Amendment because where there is no violation, there is no duty to intervene). See also Wilson v. Wigen, 1997 WL 158117, at * 2 (Mar. 31, 1997) (finding that although plaintiff's allegations of medical maltreatment resulting from defendants' failure to intervene after plaintiff made complaints about his medical care served to meet the awareness prong of the Farmer v. Brennan deliberate indifference test, it does not satisfy plaintiff's burden of showing that defendants made the inference that plaintiff was in serious medical danger).

### b. Claims against Defendant Fonder

Plaintiff has brought an Eighth Amendment claim against Dr. Fonder, the medial director of the MHU at SCI Cresson and Plaintiff's treating psychiatrist while Plaintiff was confined there. Plaintiff alleges that Dr. Fonder diagnosed Plaintiff as suffering from "major depression disorder" due to the conditions in the SMU at SCI Fayette and that, although it was Dr. Fonder's professional opinion that it was highly likely that Plaintiff would get worse in the SMU, she declined to recommend that Plaintiff be transferred out of the SMU allegedly stating to Plaintiff that "my administrators told me not to get caught up in anything between you and the DOC." ECF No. 75, ¶¶ 52, 54. Plaintiff claims that Dr. Fonder intentionally minimized Plaintiff's mental health diagnosis and refused to recommend housing outside of the SMU which contributed to Plaintiff's mental deterioration.[10] Id. at ¶ 77.

Defendants argue that Plaintiff's claim against Dr. Fonder is subject to summary judgment because it is rebutted by Plaintiff's medical records as well as Dr. Fonder's

---

[10] The Court notes here that when Plaintiff was returned to SCI Fayette from the MHU at SCI Cresson he told Dr. Saavedra that Dr. Fonder *had* recommended that he be transferred out of the SMU and into the SSNU, which is wholly inconsistent with his present assertion. Nevertheless, the record shows that Dr. Fonder recommended only that Plaintiff be assessed for a possible transfer "based upon how patient does from a mood standpoint." ECF No. 119-3, p. 2.

representations in her affidavit in which she states that her initial diagnosis and her diagnosis upon discharge remained the same, namely, that Plaintiff suffered from depressive disorder NOS and antisocial personality disorder. Indeed, Plaintiff's medical records show that Dr. Fonder consistently stated that Plaintiff suffered from depressive disorder NOS and antisocial personality disorder -- a diagnosis with which two other doctors who evaluated Plaintiff at SCI Cresson concurred.[11] ECF No. 119-3, pp. 1, 3, 42, 69-70, 87, 96; ECF No. 119-4, pp. 14, 40-41. More importantly, in responding to Defendants' Statement of Facts submitted in conjunction with the instant Motion for Summary Judgment, Plaintiff admits that Dr. Fonder's diagnosis following her initial evaluation remained the same at discharge, namely, "depressive disorder not otherwise specified and antisocial personality disorder." ECF No. 119, ¶¶ 11, 47; ECF No. 134, ¶¶ 11, 47.

Dr. Fonder has also provided an affidavit in which she has attested to the fact that her diagnosis of depressive disorder NOS necessarily reflects that Plaintiff did not fulfill the diagnostic criteria for major depression disorder; that she would not have attributed Plaintiff's disorder to the conditions in the SMU at SCI Fayette, because she was not familiar with the SMU at SCI Fayette; that she would not have encouraged Plaintiff to believe that any condition of his housing unit out of his control would cause him to suffer depression; that she was never of the opinion that Plaintiff suffered from any mental illness that prohibited him from being housed in any particular correctional environment; that she never told Plaintiff that it would be detrimental

---

[11] In addition, Dr. Roman, who treated Plaintiff at SCI Albion after he was transferred from SCI Fayette, and upon whose evaluation Plaintiff relies, did not diagnose Plaintiff with major depression disorder either, but found that Plaintiff suffered from Adjustment disorder with depresses feature at Axis I and Personality disorder NOS at Axis II. ECF No. 191-1, p. 36. Although Dr. Roman noted the need to "rule out brief reactive psychosis," she also noted that the MHU staff did not indicate any signs of psychosis despite Plaintiff's statement that he had been diagnosed with depression with psychotic features and that, given Plaintiff's "potential for secondary gain to mitigate adverse circumstances - cannot exclude malingering." Id. at pp. 33, 36.

to keep him in the SMU; and that she never told Plaintiff, nor would tell any patient, that she would intentionally underdiagnose him.  ECF No. 119-6.  Notably, Plaintiff has not addressed Defendants' argument in this regard or the evidence offered in Dr. Fonder's affidavit and thus has seemingly conceded the issue.  Indeed, Plaintiff has failed to offer any evidence to counter Dr. Fonder's representations in her affidavit or in Plaintiff's medical records regarding her diagnosis, nor offered any evidence that would otherwise create a material issue for trial.[12]  As such, summary judgment should be granted with respect to Plaintiff's claims brought against Dr. Fonder.

### c.      Claims against MHM

Plaintiff's claim against MHM fails as well.  The only reference to MHM in the Second Amended Complaint is that MHM is Dr. Fonder's "administrator;" that it would be bad for business for MHM employees to cause waves with the DOC and could result in the an employee being "blackballed;" and that "MHM engaged in a custom and practice encouraging its employees to turn a blind eye and deaf ear to issues that are detrimental to the mental well-being of patients amounting to deliberate indifference in violation of the Eighth Amendment . . . ." ECF No. 75, ¶¶ 55, 78.

> The Supreme Court has determined a local governmental entity may be a "person" for purposes of § 1983 liability. *Monell v. Department of Soc. Servs.*, 436 U.S. 658, 690 ... (1978). Liability of such entities may not rest on respondeat superior, but rather must be based upon a governmental

---

[12] Elsewhere in Plaintiff's responsive brief he points to a section of the Application for Extended Involuntary Treatment that precipitated his admission to the MHU at SCI Cresson in which it is noted that "[p]er doctor, depressive illness with psychotic features" as evidencing a diagnosis that he suffers from a major depressive disorder.  ECF No. 119-3, p. 15. That portion of the form, however, was not filled out by Dr. Fonder or any other mental health care professional who evaluated Plaintiff.  Rather, it was filled out by a Mental Health Review Officer for the court.  Id. at pp. 13, 16.  Because Plaintiff's medical records, as well as the portion of the form that was filled out by Dr. Fonder, are devoid of any evidence that Plaintiff was ever diagnosed by a mental health professional as having psychotic features, the review officer's unsubstantiated statement does not serve to create a material issue of fact.

policy, practice, or custom that caused the injury. *Id.* at 690–94 ... The same
standard applies to a private corporation, like CPS, that is acting under color
of state law. *See Miller v. Hoffman*, No. CIV.A. 97–7987, 1998 WL 404034,
at *4 (E.D. Pa. July 7, 1998) (analyzing defendant CPS under Monell
standard).

Thomas v. Zinkel, 155 F. Supp. 2d 408, 412 (E.D. Pa. 2001).  See Flores v. Pa. Dep't of

Corrections, 2013 WL 2456011, at *4 (M.D. Pa. June 6, 2013) (although "[a] private health care

provider acting under color of state law . . . can be held liable under § 1983 for Eighth

Amendment violations stemming from inadequate medical treatment of prisoners . . . [s]uch

liability cannot rest on respondeat superior alone, but instead must be based on some policy,

practice, or custom within the institution that caused the injury").

Here, as argued by the Medical Defendants, Plaintiff has failed to identify any policy,

practice or custom of MHM that has allegedly caused a constitutional violation or pointed to any

evidence that such a practice or custom exists.  Indeed, as before, Plaintiff has not addressed the

Medical Defendants' argument in this regard at all and thus has seemingly conceded the issue.

MHM therefore is entitled to summary judgment as well.

## D.     Conclusion

For the foregoing reasons, it is respectfully recommended that the Motion for Summary

Judgment submitted by Defendants Beard, Meintel, Ellers, Gnall, Johnson, Coleman, Gates,

Arnell, Zaken, Walker, Bustass, Berrier, Leggett, Gallucci, Bryant, Hall, Woods, Hannah, Biser,

Fisher, and Whietsel, ECF No. 114, and the Motion for Summary Judgment of Defendants

Saavedra, Fonder, and MHM Correctional Services, Inc., ECF No. 118, be granted.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1), and Local Rule

72.D.2, the parties are permitted to file written objections in accordance with the schedule

established in the docket entry reflecting the filing of this Report and Recommendation.

Objections are to be submitted to the Clerk of Court, United States District Court, 700 Grant

Street, Room 3110, Pittsburgh, PA 15219.  Failure to timely file objections will waive the right

to appeal.  Brightwell v. Lehman, 637 F.3d 187, 193 n. 7 (3d Cir. 2011).  Any party opposing

objections may file their response to the objections within fourteen (14) days thereafter in

accordance with Local Civil Rule 72.D.2.

Respectfully submitted,

/s/ Maureen P. Kelly
MAUREEN P. KELLY
United States Magistrate Judge

Dated: July 15, 2014


cc:     Corey Bracey
        GS-4754
        SCI Smithfield
        1120 Pike Street
        Box 999
        Huntingdon, PA 16652

        Counsel of Record Via CM/ECF